IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| NATALEE A. CARRELL, | No.  56084-4-II |
| Appellant, | |
| v. | UNPUBLISHED  OPINION |
| GLACIER NORTHWEST, INC., CALPORTLAND CO., | |
| Respondents. | |

Worswick, J. — Natalee Carrell sustained an industrial injury while working at CalPortland.  Carrell's industrial insurance claim was allowed.  She returned to a modified light duty position with CalPortland, but was later terminated from her position after her supervisor discovered her using a company vehicle for personal shopping.  Following her termination, the Department of Labor and Industries (Department) issued an order denying Carrell time loss benefits.  Carrell appealed to the Board of Industrial Insurance Appeals (BIIA).  An Industrial Appeals Judge (IAJ) reversed the Department's order.  CalPortland petitioned for review, and the BIIA reversed the IAJ's decision.  Carrell appealed to the superior court, which issued an order affirming the BIIA's decision.

Carrell appeals the trial court's order. We hold that (1) the trial court did not err when it took judicial notice of the route Carrell took to conduct personal shopping, (2) substantial evidence supports the trial court's findings of fact that Carrell deviated from the most direct route between CalPortland's two plants to conduct her shopping, (3) substantial evidence supports the trial court's finding that Carrell was legitimately terminated for reasons unrelated to her industrial injury, (4) the trial court's conclusions of law flow from its findings of fact, and (5) Carrell is not entitled to reasonable attorney fees. Accordingly, we affirm.

FACTS

In October 2018, Carrell sustained an industrial injury to her shoulder while employed as a concrete mixer truck driver at CalPortland, previously known as Glacier Northwest. The Department allowed Carrell's injury claim for benefits, and Carrell had surgery on her shoulder in December.

Carrell returned to a light duty role at CalPortland in February 2019. Carrell's medical provider restricted her from lifting greater than 5 pounds, lifting items over her head, and instructed her to avoid repetitive motions with her left arm. For her light duty role, Carrell's supervisor, Mike Fields, assigned Carrell to driving a CalPortland pickup truck, and to travel between its two plants on opposite ends of Vancouver, Washington, where she did paperwork and coordinated truck schedules between the two plants. Carrell would also run errands for her employer's different job sites, picking up work supplies or lunch for crew.

On April 24, Carrell clocked in on time, at 7 AM, at the plant on the west side of Vancouver and did paperwork during the morning hours. Carrell needed to go to Kinko's for

2

paper supplies for the plant on the east side. She informed a coworker that she was going to Kinko's, and that she was then going to take her lunch break and go the east plant.

Carrell left CalPortland's west Vancouver plant in the company supplied pickup truck and went to Kinko's. From there, instead of proceeding by a southerly route on State Route 14 to the east Vancouver plant, Carrell turned north on Interstate 5, then proceeded east on State Route 500, which was a slightly longer route between the plants. Carrell then stopped at a bulk foods grocery store to conduct personal shopping, but not to get her lunch meal. Because she was unable to clock out while out of the office, Carrell made a note on a notepad that she went into the grocery store at 12:15 PM.

While Carrell was in the store, Fields arrived there to shop for a company event. It is unclear from the record what time Fields arrived at the store. Fields noticed that a truck like the one CalPortland assigned Carrell was in the parking lot. Fields waited in the parking lot for approximately ten minutes before going into the store. Fields then went into the store and found Carrell pushing a wooden flatbed cart with bulk groceries on it.

Fields asked Carrell what she was doing, and she told him she was doing personal shopping. Fields told Carrell that she was not supposed to be using the company vehicle for personal shopping and asked her if she had clocked out at the plant. She responded that she had not, and told Fields that she wrote her time down and would calculate it at the end of the day. Fields then told Carrell that she needed to put the groceries back, leave, and return to the plant. Carrell returned to the truck and made a note that it was 12:30 PM. At the end of the day, Carrell filled in her time sheet and added five minutes to the break, recording that she clocked out at 12:15 and back in at 12:35 PM.

3

The next day, Fields had a meeting with Carrell in which they talked about the route she had taken the day before. Carrell told Fields that taking State Route 500, and not State Route 14, was her preferred route. Fields then terminated Carrell's employment, and provided her with a corrective action form detailing the reasons for her dismissal. It stated, in pertinent part:

> On 4/24/19, you told the batch man that you had errands to run. At 12:17pm the yard truck was seen by two plant managers parked at Smart Foods in Vancouver, WA. The plant managers waited until 12:30pm before entering the store where you were found to have a shopping cart with personal items. You stated you went to Kinko's for work and then were taking your lunch, when asked by your manager if you logged it you stated no, you would do that when you returned. Your manager instructed you to put everything back and head back to the yard. Kinko's is a two-minute drive from the plant, Kinko's to Smart Foods is a fifteen-minute drive and Smart Foods to the plant is a fifteen-minute drive, your manager waited out front of the store [for] ten-minutes, you spent time shopping and you needed time to put your times back. This would equate to approximately an hour of personal time and is considered time theft as you noted on your time card that you took a twenty-minute lunch.

> You may not use company property, vehicles or equipment for personal gain without permission. You also may not make unauthorized stops. You have violated the following Work Rules and Standards of Employment:

> Work Rule #12, Misusing or removing from company premises-without proper written authorization-company property, records or other materials or theft from another employee.

> Work Rule # 17, Changing time punched in or out on your own timecard, deliberately falsifying your own time sheet or punching in another employee's timecard.

> Work Rule # 23, Conducting personal business during working hours or on company premises

> Work Rule #27, Drivers shall not make unauthorized stops.

> Work Rule # 28, Employees shall not use company vehicles for personal business or transportation, including driving to and from meals.

> Standards of Employment #8, Abuse, destruction, waste or unauthorized use of company equipment, facilities or materials.

Administrative Record (AR) at 261. Fields signed the document.

Carrell wrote on the corrective action form: "This is not accurate as its not exactly what happened. The person who wrote it never even spoke to me for accurate info." AR at 262.

Following her termination, the Department issued an order denying Carrell time loss benefits from April 26 to June 7, 2019. Carrell appealed to the BIIA on July 11. An IAJ held a hearing in January 2020. Fields and Carrell testified as above.

When asked why Carrell wrote on the corrective action form that the statement provided was not accurate, she testified,

> I don't agree with this 15 and 10 minute stuff because I was on my way to another plant to do their job and I was stopping, clocking out for that time period, getting back in, clocking back in, heading to the job just like I would have. It was no time – I should have not – according to what I understood, my lunch stop was in the middle of my day and I clocked out for it.
>
> In my eyes and what I was doing was not what they say here, which is shopping and driving the car in this two minute and five minute, all the stuff they have written in here about the time and drive, none of that should have ever counted because I was on my way to the other plant.
>
> I was not on my way to lunch, I was on my way to the other plant and I stopped and took my lunch, clocking out in my – like on paperwork and then continuing to the other plant, that was what was supposed to happen.

AR at 140-41.

Fields testified that State Route 14 would have been the quickest route between west and east plants and, as stated above, testified as to how long he waited in the store parking lot for Carrell before going in to find her on April 24. Fields testified it did not look as though Carrell was simply grabbing a quick bite for lunch. Carrell's counsel asked Fields whether he was more concerned with the route Carrell took or her activities along the way:

Q. So the point of your concern, if I may, is that she was not going to lunch, she was doing some shopping on her own, correct?

A. The point of my concern was the route and what she was doing, during that time she should have been going to east Vancouver to do work.

Q. Okay. And not stop along the way?

A. It depends, it depends.

Q. Well, could she have stopped for lunch?

A. If she drove by a minute mart and swung in to get a corndog, if she had done the drive-thru at McDonald's, that would be fine, I would not object to that. Going in and shopping, personal business in a company vehicle outside of the route she should have been on, I would object to that.

AR at 248-49.

Carrell's counsel then asked Fields if he was concerned about the shopping she was doing:

Q. So this is what struck you about this whole situation, correct?

A. What she had on her cart and the route she took.

Q. Well, you're saying it wasn't so much about the route she took —

A. Oh, no, it's the route.

Q. Huh.

A. I'm sorry, go ahead.

Q. Well, you mean the route, what's in your mind as far as this whole process?

A. It is the route that she took and the items on her cart.

Q. Okay. So what's more important than the other, the route that she took or the items on the cart?

A. They're equal.

AR at 249-50. However, Fields also testified that there was no written rule for which route a driver was to take between plants but even assuming that Carrell did not make any stops, he would have questioned Carrell as to why she was not travelling on State Route 14 between the plants. When asked whether another employee would have been terminated for doing the same things that Carrell did, he responded, "Yes." AR at 241.

The IAJ issued a proposed decision and order reversing the Department's order that denied Carrell's time loss benefits and remanded to the Department to award Carrell benefits. CalPortland then petitioned the BIIA for review of the IAJ's proposed decision and order.

In August 2020, the BIIA issued a decision and order reversing the IAJ's proposed decision and order and affirming the Department's order denying Carrell time loss benefits. One member of the board dissented.

Carrell appealed to superior court, which held a bench trial in April 2021. The court reviewed the board record, and the parties presented arguments, but, in accordance with RCW 51.52.115, the trial court took no additional testimony.

The trial court made its oral ruling on June 4. The court reviewed the testimony that the parties gave before the IAJ, as well as the exhibits admitted. The court read from Carrell's testimony and quoted excerpts. When the court reached the portion of Carrell's testimony regarding the route she drove on April 24, 2019, the court made a statement regarding its knowledge of the location of the store Fields discovered Carrell shopping at:

> At this point I need to interject my judicial notice. Smart & Final is no longer Smart & Final. I believe its Chef's Best Choice or something like that. It's located down the street from the Toyota dealership off of 205, and next door to a Cost Less Auto Parts. So, this Court knows exactly where this Smart & Final was at the time. And for the record, if I was to go there from the courthouse, I would take Mill Plain to I-5, go north for a mile plus, maybe not a mile, but a mile plus,

7

take SR 500, as we call it, east, all the way over I-205. There's an I-205 southbound exit off of SR 500, there is a northbound exit off of SR 500, and then there's the exit that she was describing, which would be either Gher Road to the left and the 112th Burton Road to the right. I want to clarify the Court is well aware of the location of the so-called store that the Petitioner went to.

Verbatim Report of Proceedings (VRP) at 18-19.

The trial court reviewed Carrell's testimony on the location of the CalPortland plants and Fields's testimony that he was concerned both as to the route Carrell took as well as her personal shopping. The court then reviewed the route that Carrell took to the bulk grocery store and explained that Carrell failed to testify as to the exact route she would have taken from the store to the east CalPortland plant, and noted that Carrell "made it sound as though [the store] was on her way to the east plant. . . . However, Ms. Carrell failed to state precisely what route she would have taken from [the store] back to I-205." VRP at 22. The court stated that Carrell's route to the store would have taken her more than a mile off of a direct route from State Route 500 to the east plant and "was at least two exits and several streets past her normal route to the east plant." VRP at 23. The Court concluded that Carrell's "so-called lunch trip was not as convenient as she attempted to imply." VRP at 22.

The trial court entered an order affirming the BIIA's decision on July 9. The court entered the following findings of fact:

1. Prior to sustaining her industrial injury, [Carrell] while working as a cement truck driver might make a stop ranging from 5 to 15 minutes to obtain coffee, doughnuts, corndogs, or use the restroom. Any food that would be obtained at this time would then be taken back out to the truck and eaten en route. Employees while driving a route were not allowed to stop and eat lunch at a restaurant.

2. At the time of Ms. Carrell's termination from her employment with Glacier Northwest Incorporated, she was working a physically suitable and approved light duty.

8

3. On April 24, 2019, [Carrell] was working in the Vancouver west plant. She was assigned a task to travel to Kinko's and then travel to the Vancouver east plant in order to redo the board in the driver's room. [Carrell], however, elected to travel from the west plant to Kinko's and then make a deviation for personal shopping prior to traveling to the east Vancouver plant.

4. While shopping at Smart Foods, Ms. Carrell's assigned work vehicle was observed to be in the parking lot and she was confronted by Mike Fields who noted objects in her cart that included bags of potato chips, and frozen cookie dough. Though [Carrell] indicated she had notified individuals at the Vancouver west plant that she was going to take a lunch break, Mike Fields was not able to confirm this.

5. Ms. Carrell indicated she wrote on her time card the amount of time that she was taking time off the clock for her lunch hour, but she failed to account for the entirety of the deviation.

6. The route taken by [Carrell] was not as convenient as she testified and amounted to a substantial deviation from her scheduled route.

7. Defendant provided testimony that the point of concern resulting in her termination was the route she took and going shopping for her personal business. Shopping for personal business on company time would be objectionable to most employers.

8. Ms. Carrell was at least two exits past her scheduled route and she knew time was of the essence per employer policy.

9. There was no evidence provided that her termination was circumstantial in nature and no evidence provided that she was treated differently from other employees. To the contrary, Mike Fields testified that any other employee similarly situated would have been treated similarly in terms of the disciplinary action and the standards of employment.

10. Ms. Carrell was legitimately dismissed by her employer for reasons unrelated to her industrial injury.

Clerk's Papers (CP) at 28-30.

The court entered the following conclusions of law:

[Carrell] was terminated for reasons unrelated to the industrial injury and other similarly situated employees would have been so disciplined. As such, this was a legitimate dismissal by the employer. As other similarly situated employees would also have been so disciplined, the employer is not required to reinstate time

9

loss compensation benefits for the period of time from April 26, 2019 through June 7, 2019.

CP at 30.

Carrell appeals the trial court's order.

## ANALYSIS

Carrell assigns error to the trial court's findings of fact 3, 5, 6, 8, 9, 10, and its conclusions of law. Carrell argues that the trial court erred when it took judicial notice of the route she took from the west CalPortland plant to the bulk grocery store, and from there to the east plant. Carrell further argues the trial court erred when it relied in part on this judicial notice and found that Carrell made a deviation from her route between the plants for personal shopping, and when it further found that the deviation was not the fastest route to the east plant. Next, Carrell argues that the trial court's finding that she was terminated for reasons unrelated to her industrial injury was not supported by substantial evidence. Finally, she argues that the trial court's conclusions of law do not flow from the findings of fact and that the trial court did not apply the correct legal standard in reaching its conclusion. Each of Carrell's arguments fail.

## I. LEGAL PRINCIPLES

Our review in cases on appeal from the BIIA is governed by the Industrial Insurance Act (IIA), Title 51 RCW. RCW 51.52.140. "We review the trial court's decision, not the BIIA's decision." *Clark County v. Maphet*, 10 Wn. App. 2d 420, 429, 451 P.3d 713 (2019). Thus, we review only whether the trial court's findings of fact were supported by substantial evidence and then review, de novo, whether the conclusions of law flow from the findings of fact. *Laskowski v. Dep't of Labor & Indus.*, 12 Wn. App. 2d 806, 810, 460 P.3d 697 (2019). Unchallenged findings of fact are verities on appeal. *Laskowski*, 12 Wn. App. 2d at 813.

10

We view the evidence in the light most favorable to the party that prevailed before the BIIA. *Coaker v. Dep't of Labor & Indus.*, 16 Wn. App. 2d 923, 931, 484 P.3d 1265 *review denied*, 198 Wn.2d 1020 (2021). Accordingly, we do not reweigh the evidence or reassess the weight to be given to reasonable but competing inferences. *Coaker,* 16 Wn. App. 2d at 931.

RCW 51.32.090 makes time loss compensation available for those who have suffered an industrial injury when the injured person has a period of temporary total disability. *See also Hunter v. Bethel Sch. Dist. & Educ. Serv. Dist. No. 121 Worker's Comp. Tr.*, 71 Wn. App. 501, 506, 859 P.2d 652 (1993). RCW 51.32.090(4)(b) provides that a licensed medical provider may certify a temporarily totally disabled employee to return to work for an employer in an available role with different physical activities from the worker's original duties. The statute then provides, in pertinent part:

> The worker's temporary total disability payments shall continue until the worker is released by his or her physician or licensed advanced registered nurse practitioner for the work, and begins the work with the employer of injury. If the work thereafter comes to an end before the worker's recovery is sufficient in the judgment of his or her physician or licensed advanced registered nurse practitioner to permit him or her to return to his or her usual job, or to perform other available work offered by the employer of injury, the worker's temporary total disability payments shall be resumed.

RCW 51.32.090(4)(b).

Under RCW 51.52.160, the BIIA publishes "significant decisions" that contain the decisions the board considers important in carrying out its duties. WAC 263-12-195. Although administrative decisions are not binding, we consider significant decisions of the board to be persuasive authority in interpreting the IIA. *Maphet*, 10 Wn. App. 2d at 441.

We have previously held that when an employer makes light duty work available, and the worker's medical provider certifies that she is capable of performing it, the worker is not entitled

to time loss benefits. *Hunter*, 71 Wn. App. at 506-07. In the significant decision of *In re Chad Thomas*, No. 00 10091 (Wash. Bd. of Indus. Ins. Appeals July 31, 2001), the BIIA concluded that when the worker is terminated from the light duty position for reasons wholly unrelated to the industrial injury, and the discipline would likely have been administered to any of the employer's workers in a similar situation, then the worker's right to time loss benefits does not resume because the light duty work would have been available to her but for her wrongful conduct.

## II. JUDICIAL NOTICE

Carrell argues that the trial court erred when it took judicial notice of the route Carrell took when she travelled from the west Vancouver CalPortland plant to the bulk grocery store, and from the store to the east plant. We disagree.

We review de novo whether the trial court properly took judicial notice of a fact. *Fusato v. Wash. Interscholastic Activities Ass'n*, 93 Wn. App. 762, 771, 970 P.2d 774 (1999). A judicially noticed fact is one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ER 201(b). "A court may take judicial notice, whether requested or not." ER 201(c).

Maps, distances, and directions may be subject to judicial notice under ER 201. *See Concerned Friends of Ferry County v. Ferry County*, 191 Wn. App. 803, 825, 365 P.3d 207 (2015). Here, it is plain from the detail with which the trial court recited the locations of highways, stores, and streets, that the locations at issue along Carrell's route were "known within the territorial jurisdiction of the trial court." ER 201(b). Likewise, the court's explanation of

locations and distances could be readily determined by a map, and Carrell makes no showing that the accuracy of court's geographic statements can reasonably be questioned. Accordingly, we hold that the trial court did not err when it took judicial notice of the route Carrell followed.

### III. ROUTE TAKEN

Carrell argues that the trial court erred when it "focus[ed]" on the route Carrell took to the bulk grocery store and found that Carrell did not take the most convenient route from the west plant to the east plant. Br. of Appellant at 15-16. Carrell's objections to the trial court's findings of fact 3, 5, 6, 8, and 9, are based on this judicial notice. We hold that substantial evidence supports the trial court's findings.

As stated above, we review whether the trial court's findings of fact were supported by substantial evidence. *Laskowski*, 12 Wn. App. 2d at 810. "Substantial evidence will support a finding when the evidence in the record is sufficient to persuade a rational, fair-minded person that the finding is true." *Watson v. Dep't of Labor & Indus.*, 133 Wn. App. 903, 909, 138 P.3d 177 (2006).

In finding of fact 3, the trial court found that Carrell "elected to travel from the west plant to Kinko's and then make a deviation for personal shopping prior to traveling to the east Vancouver plant." CP at 29. Carrell testified that she took this route in part to conduct personal shopping. Fields saw Carrell in the store with a large shopping cart. Fields testified the route Carrell took along State Route 500 was longer than the State Route 14 route between the west and east CalPortland plants, and the trial court also took judicial notice of this fact. Thus, the evidence in the record is sufficient to support the finding that Carrell made a deviation for personal shopping.

In finding of fact 5, the court found, "Ms. Carrell indicated she wrote on her time card the amount of time that she was taking time off the clock for her lunch hour, but she failed to account for the entirety of the deviation." CP at 29. Carrell wrote on her time card that she took a break from 12:15 to 12:35 PM. But in the corrective action form that terminated Carrell's employment, CalPortland wrote that Carrell's route "would equate to approximately an hour of personal time and is considered time theft as you noted on your time card that you took a twenty-minute lunch." AR at 261.[1] Viewing the evidence in the light most favorable to CalPortland, substantial evidence supports finding of fact 5.

In finding of fact 6, the court found, "The route taken by plaintiff was not as convenient as she testified and amounted to a substantial deviation from her scheduled route." CP at 29. The same evidence that supports finding of fact 3 supports this finding and we will not reweigh the competing inferences from Fields's and Carrell's testimony (and the facts within the trial court's judicial notice) on the difference in time between the two routes. Accordingly, substantial evidence supports finding of fact 6.

In finding of fact 8, the court found, "Ms. Carrell was at least two exits past her scheduled route and she knew time was of the essence per employer policy." CP at 30. In explaining its understanding of the geographic facts within the purview of its judicial notice, the court stated that Carrell's route to the store would have taken her more than a mile off a direct route from State Route 500 to the east plant and "was at least two exits and several streets past her normal route to the east plant." VRP at 23. As explained above, this observation was geographic information within the court's knowledge and subject to judicial notice. That time

---

[1] The Corrective Action Form was admitted as Exhibit 2.

was of the essence is an inference readily drawn from CalPortland's work rules as recited in the corrective action form that prohibited falsifying time sheets, prohibited conducting personal business during working hours or on company premises, prohibited drivers from making unauthorized stops, and prohibited employees from using company vehicles for personal use. Substantial evidence supports finding of fact 8.

In finding of fact 9, the court found, "There was no evidence provided that [Carrell's] termination was circumstantial in nature and no evidence provided that she was treated differently from other employees." CP at 30. Fields testified to this fact and we will not reweigh competing inferences. Substantial evidence supports finding of fact 9.

Accordingly, substantial evidence supports each of the trial court's findings of fact to which Carrell assigns error. Thus, we hold that the trial court did not err when it focused on the route Carrell took.

## IV. TERMINATION FOR CAUSE

Carrell argues that the trial court erred when it found that she was terminated from her employment for reasons wholly unrelated to her industrial injury. Carrell relatedly assigns error to the trial court's finding of fact 10, and the trial court's conclusions of law. We disagree.

We review a conclusion of law erroneously described as a finding of fact in the same manner as a conclusion of law. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). We review conclusions of law de novo to determine whether they flow from the findings of fact. *Laskowski*, 12 Wn. App. 2d at 810.

In finding of fact 10, the trial court found, "Ms. Carrell was legitimately dismissed by her employer for reasons unrelated to her industrial injury." CP at 30. Because this embraces the

legal conclusion of the ultimate issue, we treat it as a conclusion of law. Accordingly, we review whether this conclusion, and the others to which Carrell assigns error, flow from the findings of fact.

In addition to entering finding of fact 10, the trial court entered a nearly identical conclusion of law, which stated, "[Carrell] was terminated for reasons unrelated to the industrial injury and other similarly situated employees would have been so disciplined." CP at 30. The court then concluded, "[a]s such, this was a legitimate dismissal by the employer. As other similarly situated employees would also have been so disciplined, the employer is not required to reinstate time loss compensation benefits for the period of time from April 26, 2019 through June 7, 2019." CP at 30.

As explained above, the trial court's findings of fact are supported by substantial evidence. This evidence includes CalPortland's corrective action form, which stated the work rules that Carrell had violated by doing personal shopping in a company vehicle and taking a longer route than necessary between plants. It also includes Fields's testimony that any other worker discovered taking such action would be similarly disciplined. This evidence supports the trial court's findings that Carrell deviated from CalPortland's preferred route for personal shopping while using a company vehicle. These activities were contrary to the CalPortland work rules. Accordingly, the conclusion that CalPortland terminated Carrell's employment for reasons wholly unrelated to her industrial injury flows from the findings of fact.

Carrell cites the BIIA significant decision of *In re Chad Thomas*, No. 00 10091, (Wash. Bd. of Indus. Ins. Appeals July 31, 2001), to argue that her termination was not wholly unrelated to her industrial injury. But *Thomas* actually supports the trial court's conclusions of law.

16

There, as here, the employer testified that the injured worker was *not* terminated for reasons related to his industrial injury. *Thomas*, No. 00 10091, at 3. The BIIA concluded that the employer did not terminate the worker's employment for reasons allowing for time loss benefits under RCW 51.32.090(4). *Thomas, No. 00 10091,* at 4. In reaching this conclusion, the BIIA analyzed whether the worker's termination was "wholly unrelated" to the industrial injury or the worker's compensation benefits. *Thomas, No. 00 10091,* at 3. The trial court did the same here, and reached the same conclusion.

Carrell quotes the dissenting opinion from the BIIA decision and order in an apparent argument that CalPortland must show Carrell's termination was wholly unrelated to her industrial injury against "the framework" of her statutory benefits. Br. of Appellant at 20. But this is not the standard, and the mere fact that Carrell was receiving benefits and on light duty is not enough to raise the inference that her termination was not unrelated to the industrial injury. Accordingly, we hold that the trial court did not err when it concluded that Carrell's termination was wholly unrelated to her industrial injury.

## V. The "Unreasonable" Standard

Carrell argues that her termination was "so unreasonable or unjustified as to warrant the view that CalPortland intentionally made the light duty work unavailable to her, which would not disqualify her from receiving time loss benefits." Br. of Appellant at 21. But this is not the standard on which we review the trial court's findings and conclusions from a BIIA decision. As explained above, we review only whether the trial court's findings of fact were supported by substantial evidence and then review, de novo, whether the conclusions of law flow from the findings of fact. *Laskowski*, 12 Wn. App. 2d at 810.

17

Carrell cites the BIIA decision *In re Sean M. Murphy*, No. 95 5987 (Wash. Bd. of Indus. Ins. Appeals Feb. 14, 1997), to argue that this court must determine whether Carrell's termination is "unreasonable or unjustified" because that was part of the BIIA's determination here. Br. of Appellant at 21-22. But we do not review the BIIA's determination; we review the trial court's decision. *Maphet*, 10 Wn. App. at 429. Moreover, *Murphy* is not listed among the BIIA's significant decisions, and thus, we need not consider *Murphy* as persuasive authority. *See Maphet*, 10 Wn. App. 2d at 441 nn.5-6 (explaining that significant decisions published by the BIIA are the ones the board considers of substantial importance (citing RCW 51.52.160 and WAC 263-12-195(1))); *O'Keefe v. Dep't of Labor & Indus.*, 126 Wn. App. 760, 767 n.3, 109 P.3d 484 (2005) (noting that the parties cited *Murphy* but that the BIIA did not designate it as a significant decision; the court did not apply the standards therefrom). Accordingly, we do not apply the standard from *Murphy*, and, as explained above, we hold that the trial court's conclusions of law flow from the findings of fact.

## ATTORNEY FEES

Carrell argues that this court should award her reasonable attorney fees on appeal. We disagree.

RCW 51.52.130 provides, in pertinent part, "If, on appeal to the . . . appellate court from the decision and order of the [BIIA], said decision and order is reversed or modified . . . a reasonable fee for the services of the worker's or beneficiary's attorney shall be fixed by the court." Because we do not reverse or modify the trial court's order, which affirmed the decision and order of the BIIA, we do not award Carrell attorney fees.

No. 56084-4-II

## CONCLUSION

We hold that the trial court did not err when it took judicial notice of the geography and distances of the route that Carrell took during the events leading up to her termination. We further hold that the trial court's findings of fact were supported by substantial evidence and that the court's conclusions of law flow from those findings. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Cruser, A.C.J.

Price, J.